No. 24-1458

# United States Court of Appeals
## For the First Circuit

JOHN DOE,

Plaintiff - Appellant,

v.

UNIVERSITY OF MASSACHUSETTS; TRUSTEES FOR THE UNIVERSITY OF MASSACHUSETTS; HANNAH MONBLEAU, in her official and individual capacities; KATE LEGEE, in her official and individual capacities; ESMERALDA LEVESQUE, in her official and individual capacities, a/k/a Esmeralda Mendez; ADAM DUNBAR, in his official and individual capacities,

Defendants - Appellees,

BRETT SOKOLOW,

Defendant.

Appeal from the United States District Court for the District of Massachusetts
Case No. 1:23-cv-12077, Honorable William G. Young, Senior U.S. District Judge

**REPLY BRIEF OF APPELLANT JOHN DOE**

Ilya I. Feoktistov, Esq.
LAW OFFICE OF
ILYA FEOKTISTOV
292 Newbury Street, No. 544
Boston, MA 02115
(617) 462-7938
if@ilyafeoktistov.com

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ......................................................................................................1

REPLY TO APPELLEES' COUNTERSTATEMENT OF FACTS .........................1

ARGUMENT ..............................................................................................................6

      I.   Disruptive or Forecasted Disruptive Speech or Expressive Conduct.7

      II.  Speech or Expressive Conduct that Interferes with Right of Others..8

      III. School Sponsored Speech or Expressive Conduct ...........................12

CONCLUSION .........................................................................................................12

SERVICE CERTIFICATE .......................................................................................13

# TABLE OF AUTHORITIES

**Cases**

Bethel Sch. Dist. v. Fraser,
    478 U.S. 675 (1986) ............................................................................. 6, 7, 8, 12

*Brown v. Hot, Sexy & Safer Prods.*,
    68 F.3d 525 (1995) ............................................................................................ 9

*Gay Students Org. of Univ. of N.H. v. Bonner*,
    509 F.2d 652 (1st Cir. 1974) ................................................................... passim

*Harper v. Poway Unified Sch. Dist.*,
    445 F.3d 1166 (9th Cir. 2006) ......................................................................... 9

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) .................................................................................. 7, 12

*Papish v. Bd. of Curators of Univ. of Mo.*,
    410 U.S. 667 (1973) ............................................................................. 1, 6, 7, 9

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ................................................................................ 7, 8, 9

**Rules**

Restat 2d of Torts, § 21 ....................................................................................... 11

Restat 2d of Torts, § 31 ....................................................................................... 11

# INTRODUCTION

In their Brief, the Appellees resolutely avoid engaging with one fact and two cases that are fatal to their argument. The two cases are *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 669-70 (1973) and *Gay Students Org. of Univ. of N.H. v. Bonner*, 509 F.2d 652 (1st Cir. 1974), which merit a mere footnote for an irrelevant proposition in the Appellees' Brief, at 33 n.8, and which are discussed in more detail in the argument below.

## REPLY TO APPELLEES' COUNTERSTATEMENT OF FACTS

It is an undisputed fact that CT, the original complainant against Appellant admitted to the Appellees at the Hearing Panel **"she and other students were, in fact, drinking on the night of May 6, 2023,"** (R.A. 015) Appellant and KG in fact saw them drinking on the night of May 6, 2023, and that the very next day, for the first time ever, CT and other students filed complaints about an entire year's worth of alleged speech and expressive conduct by John Doe and KG.

This timing, coming so late after the fact, is entirely inconsistent with the District Court's findings that Doe's speech and expressive conduct created both an actual and a forecasted substantial disturbance or disorder on the school premises. The timing also creates serious doubts about the complainants' credibility, in the first place, given the obvious motivation to discredit any reports Appellant or KG may have made about the complainants' drinking party. Lastly, the timing would

explain the complainants having "reported their concern that Doe had been 'threatening' that he knew professional staff (as opposed to student RAs) in UMass Lowell's Residence Life office." *Cf.* Appellee Brief at 3.

Appellant complained to the District Court in the joint pre-trial memorandum that Appellees are "steadfastly refusing to consider the critical issue of the complainants' credibility created by the timing of their complaints on the day after Doe caught complainant C.T. and several other students violating the UMass Lowell Alcohol Policy." *See* ECF No. 31 at 7. Yet the District Court steadfastly refused to consider this critical issue as well. It would be one thing if either the Appellees or the District Court addressed the fact of the drinking party and reasonably found Appellant's arguments wanting. However, both the Appellees in their Brief and the District Court in its decision—to the absolute and utter frustration of Appellant and his counsel—continue pretending not to notice the existence this fact, like the proverbial flickering gaslight. Both the Brief and the decision dishonestly start their timelines: "On May 7, 2023. . ." *See* Appellee Brief 1; Add.12.

The feigned blindness is not for Appellant's lack of trying to make this fact obvious. At the very beginning, during Appellee Hannah Monbleau's investigation, Doe told her that "he is surprised about these allegations but isn't surprised they reported him because he thinks they wanted to report him before he

reported the May 6th party." (R.A. 107) Doe told Monbleau he "believes that because of the May 6th party, the group is reporting him," that "this is a character assassination," and that "[t]here are so many red flags that the people in this group have themselves (drinking, smoking, etc.)." (R.A. 113) Doe then wrote to Monbleau:

> this is definitely related to May 6th party which included for sure CTZ (as she was seen waving wine bottle at RAs on duty) and at least one or two more complainant or witnesses, complaining and galvanized other female RAs who are their friends or who sympathized to their stories (false as it may be) and decided to rally with them by inventing vague incidents. . . . I mentioned noise complaints, which was something that I indicated to when we saw them during our rounds on May 6th night (I have also attached image from DI's Instagram . . . The image clearly shows that they were shows them doing, what they stopped doing once they saw me and KG on our rounds.
>
> (R.A. 143-44)

KG also corroborated Doe's claims about the drinking party from the start, telling Monbleau:

> As I and John Doe were performing our last duty rounds for the night, we came across fellow RAs and others partying in a RA suite on the 2nd Floor West wing. We greeted our fellow RAs and passed a few rooms away from the suite I turned back to a sound and saw CT coming out from the RA suite in the passage and waving a Wine bottle towards me holding one hand and waving the other hand simultaneously.
>
> (R.A. 127)

The Appellees' Brief does not merely ignore critical issues of fact—it fabricates some of them. The claim that "Doe did not dispute much of the behavior

3

[*sic*] that Monbleau described in the [Investigative R]eport," *see* Appellee Brief at 19, is mendacious—Doe did dispute almost all of the alleged speech and expressive conduct, including in statements to Monbleau that are included in the report itself. As Appellees admit, Doe did not recall making the comment about eating food while having sex. *See id.* The Appellee's Brief states that Doe "did not deny making a comment about shaving his testicles," *see id.*, yet Monbleau's own notes in the report state that Doe "[n]ever said comment about shaving testicles. . . . Didn't say that there were pubes on the floor. He claims that he suffers from OCD and needs his apartment to be clean all the time." (R.A. 105) Doe provided a floor plan of his room that showed it would have been impossible for him to lay down or for complainant J.T. to sit where she and Appellees now claim he laid and she tried to sit. (R.A. 152) Doe did not admit to "making a comment about sticking his penis in G.D.'s face," cf. Appellee Brief at 19, he admitted to comparing "unwanted sexual conduct with unwanted religious proselytism" during a heated discussion about religion. (R.A. 153) Doe did not admit to any of the other vaguely-filthy allegations about thigh touching and leg spreading that Appellees now have dredged up from the complainants' initial complaints and interviews in the Investigative Report; and neither Monbleau nor the Hearing Panel Appellees ever credited these allegations in the first place.

4

Doe only has admitted to requesting hugs and, as to "[a]nyone who uses the [shaker] plate [in his room that]- he would use his leg to help them guide to where their feet should go so they didn't get injured," because "he didn't want to be responsible if they got hurt." (R.A. 105) It is Appellees, aided to some extent by the dirty imaginations of their counsel, who are trying to maximize the significance of otherwise platonic speech and expressive conduct by misrepresenting it as being done with sexual intent. It is Appellees and their counsel who see the word "hug," and automatically think "sex." It is Appellees and their counsel who perversely appear to view feet as sexual organs; ignorant of the fact that Doe's Indian culture famously considers them to be untouchable parts of the human body.

Lastly—if Doe's behavior was so abhorrent that it deserved punishment, Appellees fail to explain why KG's arguably far more abhorrent behavior, as alleged to them by the same complainants, actually was not. After all, if we are to believe CT's statements in Monbleau's Investigative Report: "When John Doe left the room, EZ and KG were alone, and KG had a blanket over him and was getting hard." (R.A. 109) According to Appellees' disciplinary decisions in this matter, becoming visibly erect under a blanket while alone with a coworker is totally normal behavior that passes disciplinary muster, while Doe's hug requests are "sexual misconduct" that do not. As matters of fact, logic, and human experience, this is neither a rational disciplinary decision nor a serious definition of sex.

5

## ARGUMENT

The fatal significance of *Papish*, 410 U.S. 667 and *Bonner*, 509 F.2d 652, for Appellees' legal argument and the District Court's is best described by the following conceptual diagram:



The concept is as simple as it is well-settled: Under *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 683 (1986), K-12 schools may, but universities may not, discipline students for offensive speech or expressive conduct because such speech is "seriously damaging to [a] less mature audience." In their trial brief, Appellees argued that Doe's comments and expressive conduct were offensive, and that "[e]ven a single offensive comment may be the basis for a university to discipline a student." *See* ECF # 35 at 12. This is a remarkable admission by the Commonwealth's public university about how it views its so-called marketplace of ideas. It is also false, as a matter of law, because of the conceptual firewall built up

6

in Supreme Court and First Circuit case law between offensiveness under *Bethel*, 478 U.S. at 683, on the one side, and disruptiveness or interference with the rights of others under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513-14 (1969), on the other side. *See Papish*, 410 U.S. at 670 ("[T]he mere dissemination of ideas -- no matter how offensive to good taste -- on a state university campus may not be shut off in the name alone of 'conventions of decency.'"); *Bonner*, 509 F.2d at 662 ("[T]he curtailing of expression which [some] find abhorrent or offensive cannot provide the important governmental interest upon which impairment of First Amendment freedoms must be predicated.").

Because offensive speech by university students cannot be regulated under *Papish* and *Bonner*, the Appellees and the District Court have attempted to breach this conceptual firewall by taking the round peg of offensiveness and ramming, by sheer brute force of sophistry, through the polygonal lacunae of the *Tinker* and *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988) standards related to disruptive, rights-violating, and school-sponsored speech.

## I.  Disruptive or Forecasted Disruptive Speech or Expressive Conduct

Under Papish and Bonner, as Appellant argued in his trial brief and as a matter of well-settled law, the Supreme Court and the First Circuit do not consider offensive speech and expressive conduct related to sex as disruptive or potentially

7

disruptive within the meaning of these terms pursuant *Tinker*, unless such speech or expressive conduct actually rises to the level of "overt sexual activity," and so long as the university "acts in a fair and equitable manner." *See Bonner*, 509 F.2d at 663. Pursuant to *Bonner*, overt "public petting (heterosexual or otherwise), drinking in university buildings," and other conduct that actually "materially, and substantially disrupt the work and discipline of the school" may be regulated, but speech related to sex may not. *Bonner*, 509 F.2d 652, 663. Only KG's alleged conduct can be said to have risen to the level of over conduct, no pun intended, and yet the Appellees found no wrongdoing on his part (or, for that matter, on the part of the complainants for drinking in university buildings). This double standard is neither fair nor equitable. *Cf. Bonner*, 509 F.2d at 663.

## II. Speech or Expressive Conduct that Interferes with Right of Others

The round peg of offensiveness under *Bethel* also does not fit the square hole of protecting the rights of others pursuant to *Tinker*. As the Appellees admitted in their trial brief and Appellant pointed out in his, Appellees chose to discipline Appellant under the Student Conduct Code, instead of under their Title IX procedures, precisely because they determined that Appellant's conduct was not "severe, pervasive, and objectively pervasive" within the meaning of Title IX, and because "[s]exual misconduct, as defined in the Student Conduct Code, does not require the conduct to be 'severe, pervasive, and objectively offensive.'" *See* ECF

8

# 39 at 17. Therefore, at the very start of their investigation, Appellees had acknowledged that Doe's conduct did not interfere with any legally-recognized rights of the complainants not to be exposed to an objectively hostile learning environment.

Whether or not the Tinker "rights to 'be secure and to be let alone' (in Doe's own room on Doe's private exercise equipment) are limited to rights such as those that protect against 'assault, defamation, invasion of privacy, extortion and blackmail,'" *cf. Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178 & n. 18 (9th Cir. 2006), *vacated as moot*, *Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007) (*quoting Tinker*, 393 U.S. at 508), these rights certainly do not include the right not to be offended by sexually-explicit speech or conduct. *Cf. Papish*, 410 U.S. at 670; *Bonner*, 509 F.2d at 662. As Appellant argued in support of his motion for a preliminary injunction in the District Court, the alleged comments or expressive conduct by Doe to adult university students were indeed relatively banal compared to comments that the First Circuit found, in *Brown v. Hot, Sexy & Safer Prods.*, 68 F.3d 525, 541 (1995) (*cert. denied*), not to be "so severe as to create an objectively hostile environment" for fifteen-year old K-12 students; when an adult:

> 1) told the students that they were going to have a 'group sexual experience, with audience participation'; 2) used profane, lewd, and lascivious language to describe body parts and excretory functions; 3) advocated and approved oral sex, masturbation, homosexual sexual activity, and condom use during

9

promiscuous premarital sex; 4) simulated masturbation; 5) characterized the loose pants worn by one minor as 'erection wear'; 6) referred to being in "deep sh--" after anal sex; 7) had a male minor lick an oversized condom with her, after which she had a female minor pull it over the male minor's entire head and blow it up; 8) encouraged a male minor to display his 'orgasm face' with her for the camera; 9) informed a male minor that he was not having enough orgasms; 10) closely inspected a minor and told him he had a 'nice butt'; and 11) made eighteen references to orgasms, six references to male genitals, and eight references to female genitals.

*Id.* at 529.

Appellees try to overcome this problem by pointing, for the first time on appeal, to the right to be free from apprehension of a harmful or offensive contact, as protected by the common law tort of assault—and claiming that Appellant's comment comparing unwanted sexual contact with unwanted religious proselytism put GD in such a fear. As appellees accurately but only partially quote from the Second Restatement, however, "[w]ords do not make the actor liable for assault unless together with other acts or circumstances they put the other in reasonable apprehension of an imminent harmful or offensive contact with his person." Restat 2d of Torts, § 31 ("Ordinarily mere words, unaccompanied by some act apparently intended to carry the threat into execution, do not put the other in apprehension of an imminent bodily contact, and so cannot make the actor liable for an assault under the rule stated in § 21.") Moreover, it is blackletter law and embarrassing to suggest otherwise for the Appellees, who are, after all, being represented in the instant matter by the Attorney General of Massachusetts, that

10

> [a]n action which is not done with the intention [to put another in apprehension of bodily contact] does not make the actor liable to the other for an apprehension caused thereby although the act involves an unreasonable risk of causing it and, therefore, would be negligent or reckless if the risk threatened bodily harm.

Restat 2d of Torts, § 21

There is absolutely no evidence in the record that Appellant accompanied his statement comparing unwanted sexual contact with unwanted religious proselytism by any overt act whatsoever, or that any such act would have been intended to put GD in any apprehension of any sort of bodily contact with Appellant sufficient to constitute a simple assault, much less a sexual one. As for the alleged simple battery on JT, a direct demonstration of the proper way to stand for the first time on a vigorously shaking exercise machine cannot be characterized as "contact tangentially related to a piece of exercise equipment." *Cf.* Appellees' Brief at 46. Learning how to use any tool properly seems to be the sine qua non requirement for, rather than a tangent away from using it. The very point of the contact was to prevent JT from hurting herself by showing how to use the machine properly, which she consented to by climbing onto the exercise machine. (R.A. 105) And, of course, there was nothing sexual or offensive about this exercise-related contact, with even JT admitting to Monbleau that it "wasn't a huge deal at the time."

11

### III.   School Sponsored Speech or Expressive Conduct

Lastly, none of out-of-circuit cases cited by the Appellees in support of their false proposition that "[e]ven a single offensive comment may be the basis for a university to discipline a student" are applicable, since they deal exclusively with school-sponsored speech under the *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988) line of cases. *See* Appellant's Opening Brief at 28-29, n.11.

## CONCLUSION

The District Court erred by taking the round peg of the *Bethel* K-12 offensiveness standard and jamming it incongruously into the university setting, where well-settled law holds that it simply does not fit. For the foregoing reasons, this Court should reverse the District Court's judgment in favor of Defendants, grand Doe the prospective injunctive relief sought in his Complaint, and grant Doe money damages to be determined in further proceedings below.

> Respectfully submitted,
> Appellant, John Doe,
> By his attorney,
>
> _____
> Ilya I. Feoktistov, Esq.
> Bar No. 1212000
> LAW OFFICE OF ILYA FEOKTISTOV
> 292 Newbury Street, No. 544
> Boston, MA 02115
> (617) 462-7938

if@ilyafeoktistov.com

Dated: December 13, 2024.

## SERVICE CERTIFICATE

I, Ilya Feoktistov, counsel for Plaintiff John Doe in the above-captioned matter, hereby certify that on December 13, 2024, I served a true and accurate copy of the foregoing document on counsel for the parties of record by filing electronically.

Ilya I. Feoktistov, Esq.

# Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(g)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 1st Cir. R. 28.0(a)(1):

☑ this document contains __2,903__ words, **or**

☐ this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font., **or**

☐ this document has been prepared in a monospaced typeface using _____ with _____.

(s) _/s/ signature_

Attorney for John Doe

Dated: December 13, 2024